# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| LANCELOT INVESTORS FUND, L.P., *et al.*, | ) | Case No. 08 B 28225 |
| | ) | |
| Debtor. | ) | |
| ———————————————————— | ) | |
| | ) | |
| RONALD R. PETERSON, as Chapter 7 Trustee | ) | |
| for Lancelot Investor Fund, L.P., *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 10 A 1974 |
| | ) | |
| ENHANCED INVESTING CORPORATION | ) | |
| (CAYMAN) LTD., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |
| | ) | |
| SOMERS DUBLIN LTD., KBC FINANCIAL | ) | |
| PRODUCTS (CAYMAN ISLANDS) LTD., KBC | ) | |
| INVESTMENTS LTD., KBC INVESTMENTS | ) | |
| CAYMAN ISLANDS V LTD., KBC SECURITIES | ) | |
| NV, PENTAGON CAPITAL MANAGEMENT | ) | |
| PLC, PENTAGON SELECT LTD., PENTAGON | ) | Adv. No. 10 A 1980 |
| CAPITAL LTD., and HSBC SECURITIES | ) | |
| SERVICES HOLDINGS (IRELAND) LIMITED, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |
| | ) | |
| FORTIS PRIME FUND SOLUTIONS | ) | |
| CUSTODIAL SERVICES (IRELAND) LTD., | ) | |
| KBC INVESTMENTS LTD., KBC | ) | Adv. No. 10 A 2000 |
| INVESTMENTS CAYMAN ISLANDS V LTD., | ) | |
| EDEN ROCK FINANCE FUND LP, EDEN | ) | |
| ROCK FINANCE FUND LTD., and EDEN | ) | |
| ROCK FINANCE MASTER LTD., | ) | |
| | ) | |

|  |  |
|---|---|
| Defendants. ) | |
| ) | |
| FORTIS PRIME FUND SOLUTIONS ) | |
| CUSTODIAL SERVICES (IRELAND) LTD., ) | |
| KBC FINANCIAL PRODUCTS (CAYMAN ) | |
| ISLANDS) LTD., EDEN ROCK FINANCE FUND ) | Adv. No. 10 A 2003 |
| LP, PALLADIUM SERIES FUND, LLC, and ) | |
| PALLADIUM SERIES FUND LLC (PSF SERIES ) | |
| B), ) | |
| Defendants. ) | |
| ) | |
| ) | |
| FORTIS PRIME FUND SOLUTIONS ) | |
| CUSTODIAL SERVICES (IRELAND) LTD., ) | |
| KBC FINANCIAL PRODUCTS (CAYMAN ) | |
| ISLANDS) LTD., EDEN ROCK FINANCE FUND ) | Adv. No. 10 A 2007 |
| LP, PALLADIUM SERIES FUND, LLC and ) | |
| PALLADIUM SERIES FUND LLC (PSF SERIES ) | |
| B), ) | |
| ) | |
| Defendants. ) | |
| ) | |
| OZCAR MULTI STRATEGIES, LLC, ) | Adv. No. 10 A 2011 |
| ) | |
| Defendant. ) | |
| ) | |
| OZCAR MULTI STRATEGIES, LLC ) | Adv. No. 10 A 2012 |
| ) | |
| Defendant. ) | |
| ) | |
| NAUTICAL NOMINEES, LTD., and RITCHIE ) | Adv. No. 10 A 2039 |
| STRUCTURED MULTI-MANAGER LTD., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| CASTLE CREEK FUND, LP., ) | Adv. No. 10 A 2040 |
| ) | |
| Defendant. ) | |

| | ) | |
|---|---|---|
| | ) | |
| CASTLE CREEK INTERNATIONAL FUND, LTD., | ) ) | Adv. No. 10 A 2042 |
| | ) | |
| Defendant. | ) | |
| ─────────────────────────── | ) ) | |
| | ) | |
| AGILE PRIME STRATEGIES FUND, LP, AGILE PERFORMANCE FUND, LP, FORTIS BANK (CAYMAN) LIMITED, OZCAR MULTI STRATEGIES, LLC, | ) ) ) ) | Adv. No. 10 A 2045 |
| | ) | |
| Defendants. | ) | Judge Jacqueline P. Cox |

## AMENDED MEMORANDUM OPINION ON MOTIONS FOR SUMMARY JUDGMENT

Defendant Enhanced Investing Corporation Ltd. and other Defendants have sought

summary judgment under Federal Rule of Civil Procedure 56, made applicable to these adversary

proceedings by Federal Rule of Bankruptcy Procedure 7056 on the grounds that there are no

genuine disputes as to any issues of material fact and that the Defendants are entitled to judgment

as a matter of law as to those claims alleged to be statutorily barred by 11 U.S.C. §§ 546(e) and

(g), Bankruptcy Code ("Code") safe harbor provisions. For the reasons noted herein, the Motions

for Summary Judgment are GRANTED.

### I. JURISDICTION

The jurisdiction of the bankruptcy courts is limited by statute. Bankruptcy courts have

statutory authority to adjudicate proceedings "arising under," "arising in" or "related to" a case

under title 11. "Arising under" jurisdiction connotes authority to adjudicate proceedings arising

-3-

under title 11, matters under which a claim is made under a provision of title 11. This generally

includes causes of action created by title 11. "Arising in" jurisdiction connotes authority to

adjudicate administrative matters, orders to turn over property of the estate, determinations of the

validity, extent or priority of liens, contempt matters, motions to appoint an additional committee

under Code section 1102 and motions to appoint or to elect trustees and examiners under Code

section 1104. *See* COLLIER ON BANKRUPTCY ¶ 3.01 [4] [c] [I] - [iv] (Alan N. Resnick &

Henry J. Sommer eds.,16th ed.); *In re IFC,* 431 B.R. 802, 804 (Bankr. N.D. Ill. 2010).

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(a)

which provides that federal district courts have "original and exclusive jurisdiction" of all cases

under title 11 of the United States Code (the "Bankruptcy Code"). 28 U.S.C. § 157(a) allows the

district courts to refer cases under title 11 and any or all proceedings arising under title 11 or

arising in or related to a case under title 11 to the bankruptcy judges for their districts. The

District Court for the Northern District of Illinois has made a reference of cases and proceedings

filed under title 11 to the bankruptcy judges for its district. Northern District of Illinois Operating

Procedure 15(a).

Under 28 U.S.C. § 157(b)(1) a bankruptcy judge to whom a case has been referred may

enter final judgment on core proceedings arising in the case. However, due to the Supreme

Court's recent ruling in *Stern v. Marshall,* 131 S. Ct. 2594 (2011), there is uncertainty whether the

court has authority to enter final orders granting the pending motions for summary judgment as

the claims are matters not necessarily resolvable by a ruling on a proof of claim. *Marshall,* 131 S.

Ct. 2594 at 2611, 2618.

In *Ortiz v. Aurora Health Care, Inc.,* 665 F.3d 906, 914 (7th Cir. 2011) the Seventh

Circuit recently ruled that a bankruptcy court did not have authority to enter final orders on a

summary judgment motion involving state law claims, the resolution of which did not involve an

adjudication of creditor Aurora's proofs of claim.   Based on the rulings in *Stern* which found

unconstitutional a statutory grant of core jurisdiction to a bankruptcy judge to enter a final

judgment, this court will consider submitting its opinion and suggested orders herein to the

District Court as Proposed Conclusions of Law under 28 U.S.C. § 157(c)(1).[1]

    *Stern*'s ruling may mean that fraudulent transfer claims have to be resolved by Article III

judges where their resolution does not necessarily resolve a proof of claim.   However, because

resolution of the various transfer claims asserted by the Trustee could affect the extent of funds

the estate has available for distribution to its creditors, this matter implicates 28 U.S.C. §

157(c)(1) which provides:

> A bankruptcy judge may hear a proceeding that is not a core proceeding but
> that is otherwise related to a case under title 11. In such proceeding, the
> bankruptcy judge shall submit proposed findings of fact and conclusions of
> law to the district court, and any final order or judgment shall be entered by
> the district judge after considering the bankruptcy judge's proposed
> findings and conclusions and after receiving de novo those matters to which
> any party has timely and specifically objected.

28 U.S.C. § 157(c)(1).

    The Seventh Circuit has defined related to jurisdiction to include authority to adjudicate a

case when the dispute affects the amount of property for distribution or the allocation of property

among creditors. *In re Fedpak,* 80 F.3d 207, 214 (7th Cir. 1996). "Overlap between the

---

[1]The court notes that the denial of a summary judgment motion is not a final order. *Ortiz v. Jordan,* 131 S. Ct. 884 (2011).

bankrupt's affairs and another dispute is insufficient unless its resolution also affects the bankrupt's estate or the allocation of its assets among creditors." *Home Ins. Co. v. Cooper & Cooper, Ltd.,* 889 F.2d 746, 749 (7th Cir. 1989).

## II. TRUSTEE'S AVOIDANCE POWERS

The Bankruptcy Code grants a trustee or debtor in possession many avoidance powers under Sections 544, 545, 547, 548 and 550. However, those powers may not be pursued under certain circumstances.

### a. Section 547

Under Section 547 of the Code a trustee may avoid as preferences prebankruptcy transfers made within 90 days of the date on which the petition for bankruptcy relief was filed. The period is one year for transfers involving a debtor's insiders. This provision is designed (1) to discourage creditors from racing to the courthouse to enforce their rights at the expense of other creditors during the debtor's slide into insolvency and (2) to facilitate the bankruptcy policy of equal distribution among creditors by allowing a debtor to recover those payments and to distribute them to all creditors ratably. *Mortenson v. National Union Fire Ins.*, 249 F. 3d 667, 671 (7th Cir. 2001); *In re Midway Airlines, Inc.,* 69 F.3d 792, 797 (7th Cir. 1995) ("[t]he purpose of the preference statute is to prevent the debtor during his slide toward bankruptcy from trying to stave off the evil day by giving preferential treatment to his most importunate creditors. . . .").

### b. Section 545

Section 545 of the Code allows a trustee to avoid statutory liens on the debtor's property that first become effective when a bankruptcy case or other insolvency proceeding is commenced,

a custodian is appointed, a debtor becomes insolvent and at the time of certain executions against property of the debtor. This section also provides for the avoidance of liens for rent and liens not perfected at the time of the commencement of the bankruptcy case.

### c. Sections 548(a)(1)(A) and (B)

Generally, under Section 548(a)(1)(A) of the Code a trustee can avoid a transfer made with the actual intent to hinder, delay, or defraud any entity to which the debtor was or became indebted. This is the Code's actual fraudulent transfer provision. Under Section 548(a)(1)(B), a trustee can avoid a transfer made for less than reasonably equivalent value if the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer. This is the Code's constructive fraudulent transfer provision.

### d. Section 548(b)

Under Section 548(b) a trustee of a partnership may avoid transfers to a general partner in the debtor made within two years of the filing of the bankruptcy petition if the debtor was insolvent on the date of the transfer or became insolvent as a result of such transfer.

### e. Section 544

Generally, Section 544 of the Code allows a trustee to avoid transfers or obligations that are avoidable under nonbankruptcy law. It "vests the trustee with the ability of a judgment lien creditor to attach or seize both tangible and intangible property transferred by the debtor to a third party prior to filing for bankruptcy . . . ." *Alberts v. Tuft (In re Greater Southeast Community Hosp. Corp.),* 333 B.R. 506, 520 (Bankr. D.D.C. 2005).

## f. Section 546(e)

However, the Trustee cannot avoid all preferential and fraudulent transfers made

prepetition. Code Section 546(e) limits his avoiding power. Section 546(e) provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the
> trustee may not avoid a transfer that is a margin payment, as defined in section 101,
> 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of
> this title, made by or to (or for the benefit of) a commodity broker, forward
> contract merchant, stockbroker, financial institution, financial participant, or
> securities clearing agency, or that is a transfer made by or to (or for the benefit of)
> a commodity broker, forward contract, merchant, stockbroker, financial institution,
> financial participant, or securities clearing agency, in connection with a securities
> contract, as defined in section 741(7), commodity contract, as defined in section
> 761(4), or forward contract, that is made before the commencement of the case,
> except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

Congress' purpose in enacting the safe harbor was "to minimize the displacement caused

in the commodities and securities markets in the event of a major bankruptcy affecting those

industries." *QSI Holdings v. Alford (In re QSI Holdings, Inc.)*, 571 F.3d 545, 550 (6th Cir. 2009).

## g. Section 546(g)

Section 546(g) states:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, the

trustee may not avoid a transfer, made by or to (or for the benefit of) a swap participant or

financial participant, under or in connection with any swap agreement and that is made before the

commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(g).

### h. Section 550

Pursuant to Section 550 of the Code, to the extent a transfer is avoided under sections 544, 545, 547, 548, 549, 553(b), or 724(a), the trustee may recover from the initial transferee the property transferred.

### III. FACTS

Most of the facts noted herein are taken from the Trustee's Statement of Additional Material Facts for Omnibus Response to Defendants' Motions for Summary Judgment. ("Tr. SOAF") Adversary Complaint 10-1974, dkt. no. 28.

The Defendants were investors in certain hedge funds operated by Gregory Bell ("Bell") consisting of Lancelot Investors Fund, Ltd., Lancelot Investors Fund, L.P., Lancelot Investors Fund II, Ltd. and  Colossus Capital Fund, L.P.[2]

Bell formed Lancelot in 2002 as a single-investment hedge fund which invested in promissory notes (the "Petters Notes") from Petters Company, Inc. ("PCI"), a company owned by Thomas J. Petters ("Petters"). Bell later formed additional hedge funds and related special purpose vehicles designed to function as a lending arm focused on purchase order financing. From the beginning Petters told Bell that PCI needed capital to fund its purchase and sale of electronics. Petters asserted that PCI obtained purchase orders for consumer electronics from discount warehouse stores like Costco and Sam's Club (the "Retailers").  Bell was told that PCI

---

[2] The Debtors consist of five hedge funds: Lancelot Investors Fund, L.P.; Lancelot Investors Fund II, L.P.; Lancelot Investors Fund, Ltd.; Colossus Capital Fund, L.P.; Colossus Capital Fund Ltd., and fourteen related affiliates.  Trustee's Statement of Additional Material Facts.  Tr. SOAF, p. 3.

then purchased the electronics at a discount from certain suppliers, namely Nationwide

International Resources ("Nationwide") and Enchanted Family Buying Company ("Enchanted"

and together with "Nationwide" the "Vendors"). The Retailers would then pay for the

merchandise, and PCI would pay off the Petters Notes.[3]

Over the years the Debtors purchased thousands of Petters Notes issued by PCI's special

purpose vehicle, Thousand Lakes, LLC ("Thousand Lakes"). The Debtors are alleged to have

been the largest feeder funds to the Petters entities.

### a. Petters Ponzi Scheme

Petters is alleged to have operated a Ponzi scheme as there were no real purchase orders

from the Retailers, no real invoices, no actual purchases or sales of electronics, no underlying

collateral and no legitimate operations from which profits were derived to transfer to investors.

Instead, new investor money was recycled to pay off earlier investors. The principals of

Nationwide and Enchanted funneled money to PCI from the Debtors and Petters' other investors,

keeping a commission for themselves. Petters referred to this operation as "a little paper

manufacturing factory" because all of the purchase orders were fake.

Deanna Coleman, a former PCI officer, has testified that she prepared fake documents,

including invoices from Thousand Lakes to National Distributors, a Costco affiliate, and purchase

orders from Thousand Lakes to the Vendors. She also testified that the transactions described in

the loan documents were fabricated, that PCI never sold electronics to Costco and that money was

---

[3] It is now known that Enchanted operated out of a car wash owned by its principal,
Michael Catain, Tr. SOAF, at ¶ 3 and that Nationwide's principal, Larry Reynolds, had served
time in prison and was in the Witness Protection Program. *(Id.* at ¶ 4).

used to pay off other Petters investors and to fund other Petters-related companies.

Due to Bell's single-investment strategy, the Debtors' investments were heavily concentrated in Petters Notes. Petters Notes represented, at various times, 95% of each of the Lancelot Debtors' total assets. At no point did the Petters Notes fall below 50% of the Lancelot Debtors' total assets. At their height, over 50% of the Colossus Debtors' total assets were comprised of Petters Notes.

The Petters Ponzi scheme collapsed under its own weight. In 2007 PCI was unable to repay the Debtors on outstanding Petters Notes. Petters told Bell that the delay was due to Costco's delinquency in making payments to PCI, caused by the slowing economy and personnel changes.

### b. Round trip Transactions

Bell agreed, on behalf of the Debtors, to extend the terms of the Petters Notes by 90 days to avoid delinquencies. In 2008, PCI was still unable to pay on the Petters Notes. Petters suggested that he could replace the outstanding Petters Notes involving supposed Costco receivables with new Petters Notes involving supposed receivables from other retailers such as Sam's Club, BJ's and Boscov's; Bell agreed to this proposal. Bell replaced the old Petters Notes through a series of round trip transactions beginning on February 26, 2008. Bell and the Debtors sent money to PCI, purportedly to fund the purchase of a non-Costco Petters Note; PCI returned approximately the same amount of money to the Debtors within hours to make it appear as though the delinquent Costco Petters Note had been paid off. The Debtors, however, received no actual payments from PCI; Bell and the Debtors sent Petters money that Petters promptly returned with the new Petters Notes serving to create a paper trail to hide this latest form of fraud.

-11-

Bell concealed these events from the Debtors' investors. He did not alert the investors that payments on the Petters Notes slowed or that he and Petters agreed to extend the terms of the Petters Notes from 180 days to 270 days. Bell did not inform investors that the Petters Notes as extended became delinquent in early 2008 because he knew that the investors would seek to redeem their investments. In addition, Bell did not inform the investors about the round trip transactions which were structured to give the impression that Petters was making payments on the Petters Notes, as Bell and the Debtors were simply recycling the investors' new money.

Bell plead guilty in September, 2009 to one count of wire fraud relating to the round trip transaction scheme to defraud investors. He was sentenced to 72 months in federal prison. Petters was tried and convicted in December, 2009 of wire fraud, mail fraud, money laundering and conspiracy to commit mail fraud. He was sentenced to 50 years in federal prison.

The Debtors filed for Chapter 7 bankruptcy protection on October 20, 2008 (the "Petition Date"). Claims filed against the Debtors' estates currently aggregate more than $2.1 billion, mostly from investors who were unable to redeem their interests in the Debtors prior to the Petition Date. The Defendants herein redeemed some or all of their Lancelot Securities.

The redemption process involved the Defendants submitting a notice of redemption and tendering their Lancelot Securities, allegedly according to the procedures in the relevant Fund Documents. Under the Fund Documents, once net asset value was determined according to criteria in confidential information memoranda, the Lancelot Funds were obligated to pay the Defendants that amount. (Joint SOF ¶¶ 6-8, 9, 24-26.) The Fund documents describe the redemption payments as "settlements." (Joint SOF ¶ 11.) The Defendants argue that a redemption of shares in a hedge fund is tantamount to a sale of those shares, which the Trustee

-12-

seeks to avoid through his preference and fraudulent transfer claims. The Defendants in these eleven adversary proceedings received, within the four years immediately preceding the Petition Date, nearly $200 million from the Debtors, relating to the investments at issue. Trustee Ronald R. Peterson argues that consistent with the equitable considerations recognized by the United States Supreme Court in *Cunningham v. Brown* and the Bankruptcy Code's goal of "equal distribution among similarly situated creditors" these adversary proceedings are paramount to the Trustee's efforts to avoid and recover property to be divided equitably among all of the Debtors' investors. *Cunningham v. Brown*, 44 S. Ct. 424, 427 (1924).

## IV. SUMMARY JUDGMENT CONSIDERATIONS

Pursuant to Federal Rule of Civil Procedure 56, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## V. ANALYSIS

The Defendants argue that these cases involve the straightforward application of the Sections 546(e) and (g) "safe harbor" limitations on a trustee's avoidance powers and for that reason they are entitled to summary judgment as a matter of law regarding payments and transfers made to them. The Trustee resists the imposition of summary judgment on two major grounds: that the safe harbor provisions do not shield payments and transfers tainted by fraud and that avoiding the payments and transfers would not materially impact the financial markets. The Defendants argue that the Trustee's arguments look beyond the plain statutory text of the safe harbor provision by reading those exceptions into the Code.

The parties have not asserted any significant disagreement as to material issues of fact.

The safe harbor statutory provisions provide that preference and constructive fraud claims will not lie if the challenged transfers were either settlement payments made on or behalf of certain market participants, if they were made in connection with a securities contract or if they were made in connection with a swap agreement. The Trustee argues that because the payments were tainted by the Ponzi scheme fraud the safe harbors do not apply. He also argues that the challenged payments were not made in connection with the contracts between the parties and that the payments were not settlement payments.

Five federal appellate courts have addressed the scope of settlement payments in the context of Section 546(e) immunity from avoidance. The Third Circuit in *Lowenschuss v. Resorts Int'l., Inc. (In re Resorts Int'l., Inc.)*, 181 F.3d 505, 515-516 (3d Cir. 1999) noted that the term settlement payment is broad in scope in ruling that because payments for shares during a leveraged buyout are common securities transactions, they are settlement payments for purposes of Section 546(e).

The Tenth Circuit in *Kaiser Steel Corp. v. Chas. Schwab, & Co., Inc.*, 913 F.2d 846, 849-50 (10th Cir. 1990) ruled that the term settlement payment included the transfer of consideration in a leveraged buyout. In quoting A. Pessin & J. Ross, *Words of Wall Street: 2000 Investment Terms Defined* 227 (1983), the court noted that a settlement is "the completion of a securities transaction." That court also noted that the Securities and Exchange Commission filed a brief therein in which it took the position that the consummation of a leveraged buyout is a settlement payment. *Id.* at 849-50.

In *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985-87 (8th Cir. 2009), the Eight

-14-

Circuit ruled that payments made pursuant to a leveraged buyout to stockholders of a privately

held corporation in exchange for their stock was exempt from avoidance in bankruptcy pursuant

to Section 546(e) as settlement payments made by or to a financial institution.

In *Jonas v. Resolution Trust Co. (In re Comark)*, 971 F.2d 322, 323-25, (9th Cir. 1992)

the Ninth Circuit had before it a matter involving a debtor who had been involved in trading

government securities known as "Ginnie Maes" ("GNMAs"). The GNMAs represent interests in a

pool of home mortgages.  The debtor had entered into repurchase and reverse repurchase

agreements.

> In a Repo arrangement, the dealer sells specified securities to a purchaser, but also agrees
> to repurchase the securities later at the original price, plus an agreed upon additional
> amount usually representing interest on the original purchase price.  A Reverse Repo
> basically is the reverse: the dealer buys securities and agrees to resell the securities to the
> seller in the future.  Reverse Repos can function as a loan.  The seller receives cash for the
> securities, but must repurchase the securities in the future at the same price.  Thus, the
> securities "sold" to the dealer can be viewed as being collateral for a loan."

*Jonas,* 971 F.2d at 323.

The court held that the debtor's return of $9.25 million worth of securities to Great American

Federal Savings & Loan was an unavoidable transfer pursuant to Section 546(e).   The securities

represented "additional margin" in a securities transaction that the parties cancelled.

In *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.,* 651 F.3d 329, 331-33 (2d Cir.

2011), the Second Circuit discussed the circumstances surrounding Enron's early redemption of

its commercial paper:

> Enron argues that it made the redemption payments under pressure from noteholders
> seeking to recover on their investments amidst rumors of Enron's imminent implosion.
> Alfa and ING argue that Enron redeemed its commercial paper to "calm the irrational
> markets" and leave a favorable impression that would allow it to reenter the commercial
> paper market once "bad publicity" about the company's stability "had blown over."

-15-

*Enron*, 651 F.3d at 331-32.

In spite of facts that reflect the kind of rushed effort that might favor one creditor over another, the

Second Circuit ruled that Enron's early redemption of its commercial paper involved settlement

payments protected by the safe harbor of Section 546(e). *Id.* at 335.

### a. EFFECT OF TAINT OF FRAUD

The court cannot accept the Trustee's position that the redemption payments herein are not

settlement payments eligible for safe harbor protection because they may be tainted by fraud.

Congress did not exempt all fraudulent transfers from safe harbor protection, only those involving

actual fraud, claims that allege that a debtor acted "with actual intent to hinder, delay or defraud

any entity" to which the debtor was indebted. 11 U.S.C. § 548(a)(1)(A). Congress' judgment call

on this matter is clear from the opening language of Section 546(e): notwithstanding sections . . .

548(a)(1)(B) - the provision allowing trustees to avoid constructively fraudulent transfers - "the

trustee may not avoid a transfer that is a . . . settlement payment made by or to . . . a financial

participant . . . or that is a transfer made by or to. . . a financial participant . . . in connection with a

securities contract . . . ." *Id.*   Section 741(8) of the Code defines settlement payment as "a

preliminary settlement payment, a partial settlement payment, an interim settlement payment, a

settlement payment on account, a final settlement payment, *or any other similar payment*

*commonly used in the securities trade* . . . ." 11 U.S.C. § 741(8). (emphasis added).   The Trustee

laudably prefers to recover on both actual fraud and constructive fraud theories.  However, the

court has to interpret the statute in accordance with its plain meaning.  The court realizes that

Section 546(e)'s safe harbor does not cover claims for actual fraud.  Congress has excepted fraud

from protection to some extent, but not to the extent that the Trustee prefers.  The Defendants

-16-

convincingly argue that the Trustee's position is not supported by the statutory text and that it

would contravene basic tenets of statutory construction to accept the Trustee's interpretation.

The Trustee wants to except all fraudulent transactions from the protection of the safe harbor.

However, the last clause of the safe harbor provision excepts actual fraudulent transactions from

its protection where it states "except under section 548(a)(1)(A) of this title." 11 U.S.C. § 546(e).

Actual fraudulent transactions are already excepted; the Trustee's interpretation would needlessly

except from safe harbor transfers already excepted by the provision's terms. Reading Section

546(e) as the Trustee suggests renders the Section 548(a)(1)(A) actual fraud exception

superfluous.

The Trustee also argues that protected settlement payments should be limited to those that

are lawful as indicated by the Section 741(8) definition. As the Ninth Circuit Bankruptcy

Appellate Panel notes, the term "settlement payment" implies trades that comply with the

securities law. *Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.)*, 321 B.R. 527

(B.A.P. 9th Cir. 2005). However, Grafton dealt with trades in illegal securities. The term "or any

similar payment commonly used in the securities trade" in the definition of settlement payments at

11 U.S.C. § 741(8) refers to the words immediately preceding it, "a final payment." It does not

mean that the examples of settlement payments noted therein must be appropriate in all respects.

Section 546(e) itself does not limit its safe harbor immunity to payments that are appropriate in all

respects, but only to those that do not represent actual fraud.

Other courts have refused to award Section 546(e)'s protection to fraudulent conduct. In

*Wider v. Wootton*, 907 F.2d 570, 573 (5th Cir. 1990) in the context of a preference action, the

Fifth Circuit declined to extend Section 546(e)'s protection to a stock transfer. It refused to apply

what that court termed the stockbroker defense of Section 546(e) to shield payments a stockbroker

made to a client because doing so would lend judicial support to 'Ponzi' schemes by rewarding

early investors at the expense of later victims.  In arriving at that conclusion the court held that the

client was not a customer since securities were purchased not with the client's funds but with

funds from later clients/customers.  The stockbroker's fraud meant that the securities involved

were not held in the ordinary course of business, a requirement of the statutory definition of

customer at 11 U.S.C. § 741(2)(A).  In *Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron

Corp.),* 323 B.R. 857, 876 (Bankr. S.D.N.Y. 2005), a bankruptcy court noted that safe harbor

provisions do not protect transfers that are illegal and unenforceable under state law.  However,

that ruling may not be strong precedent given the Second Circuit's recent broad interpretation of

the safe harbor provision in *Enron v. Alfa.,* 651 F.3d at 329.  In *Picard v. Merkin (In re Bernard L.

Madoff Inv. Sec., LLC),* 440 B.R. 243, 266-68 (Bankr. S.D.N.Y. 2010) a bankruptcy court refused

to shield payments made by a Ponzi scheme operation under Section 546(e).  The Defendants

therein were insiders who might have known of the Ponzi scheme fraud.  The court also held  that

assertion of the safe harbor affirmative defense was premature.  A district court refused to grant

leave to appeal that decision.  *See* 2011 WL 3897970, at *12-13 (S.D.N.Y. 2010).

Here, the issue before the court is whether transactions tainted by massive fraud are the

kind of business transactions Congress meant to protect.  Congress meant to protect legitimate

transactions, not massive Ponzi schemes.  By excepting transfers representing actual fraud,

Congress has refused to extend safe harbor protection to massive Ponzi schemes.  In addition "[a]

majority of federal courts have held that proof of operation of a Ponzi scheme is sufficient to

establish actual intent to hinder, delay, or defraud creditors so as to permit avoidance as a

fraudulent transfer under Bankruptcy Code Section 548(a)(1)(A)." *Whitley v. Swofford (In re Whitley),* Case No. 10-10426, Adv. No. 11-02038, 2012 WL 170135, at * 3 (Bankr. M.D.N.C. Jan. 19, 2012). Ponzi scheme transfers "have achieved a special status in fraudulent transfer law" from which intent to defraud may be inferred. *In re Cohen,* 199 B.R. 709, 717 (B.A.P 9th Cir. 1996). The Trustee can pursue Ponzi scheme transfers as they are essentially presumed to be actual fraudulent transfers, excepted from the safe harbor of Section 546(e).

Courts have held in the context of preferential transfers that transactions of fraudulent enterprises do not qualify for the protection provided by certain statutory defenses. Under Section 547(c)(2) of the Code, defendants in preference actions who have received transfers from businesses involved in massive frauds have not been allowed to use the ordinary course of business defense to defeat trustees' preference claims. *Computer World Solution, Inc. v. Apple Fund, L.P.,* 427 B.R. 680, 693-94 (Bankr. N.D. Ill. 2010). There it was held that "the exception to preference liability applies to payments made by a legitimate business, not payments made by a fraudulent business. The measure of business conduct for purposes of this defense should be limited to the legitimate practices of legitimate businesses." "[O]rdinary businesses do not pay fictitious profits or systematically defraud their customers or their lenders." *Computer World Solution Inc.,* 427 B.R. at 693-94 (citing *In re M & L Bus. Mach. Co.,* 84 F.3d 1330, 1340 (10th Cir 1996)). That kind of general provision regarding fraud is not available where Congress has specifically protected constructively fraudulent transfers.

The scope and definition of the term settlement payment in Section 546(e) was vital to a district court's appellate decision in *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.),* 263 B.R. 406, 478-80 (S.D.N.Y. 2001) where the court discussed the applicability of Section

546(e) to fraudulent transactions. That case involved criminal conduct of a stockbroker in manipulating stock prices through phony trades. Hanover Sterling & Co. ("Hanover"), a stockbroker, while aware that regulators would shut it down for violating net capital rules, illegally hid its predicament long enough to enable its brokers to execute fake purchases and fake short sales for certain clients. Hanover posted "payments" to the accounts of the favored customers based on the fake trades. The purpose of the phantom transactions was "to enhance the SIPC ("Security Investors Protection Corporation") claims of the Claimants." *Id.* at 474. The district court reviewed the history of the statute and the Section 741(8) definition of settlement payment, focusing on the normative part of the definition, "commonly used in the securities trade." It held that the phantom payments were so steeped in fraud that they could not be deemed to be normal and refused to recognize the Section 546(e) defense therein. *Id.* at 478.

### b. WHETHER AVOIDING TRANSFERS AFFECTS THE STABILITY OF THE SECURITIES MARKET

The Trustee argues that the Defendants cannot prevail on their summary judgment motions because they have not shown that his avoidance of the transfers would destabilize the markets. He alleges that Section 546 is ambiguous on this point, making it appropriate to examine Congressional intent on the issue. Some courts have denied defendants' dispositive motions on this basis. However, Congress did not express its concern in this regard by requiring defendants who seek the safe harbor of Section 546(e) to prove that avoidance of their transfers would cause market instability. The statutory language does not address market impact. The Defendants need not prove that avoidance would cause market instability.

### c. WERE REDEMPTION PAYMENTS MADE IN CONNECTION WITH A SECURITIES CONTRACT?

The Trustee argues that the amount of the redemption payments the Defendants received were so excessive the payments were not made "in connection with" the underlying contracts. The court disagrees. Paying the Defendants more than what they were entitled to may represent a breach of contract. However, the effort was conducted in connection with a securities agreement, albeit, not precisely or properly. In any event, the Trustee's concern addresses a requirement vital to recovery on constructive fraudulent claims, that a transferor received a less than reasonably equivalent consideration in return for the transfer. The problem for the Trustee is that Congress decided to protect constructive fraudulent transfers, transfers where the consideration is not reasonably equivalent.

### d. WHETHER PAYMENTS ARE MADE ON A PUBLIC EXCHANGE

The Trustee argues that Section 546(e)'s protection does not cover the redemption payments made herein because they were not made on a public exchange. The court disagrees. The statute does not limit its protection to transactions made on public exchanges. *In re QSI*, 571 F.3d at 550.

### e. PROTECTION OF SWAPS

To obtain protection under the Section 546(g) safe harbor the transfers must be made by or to (or for the benefit of) a financial participant and in connection with a swap agreement. The KBC entities which received the swaps assert that they are financial participants who had swap agreements and the swaps in issue were made pursuant to certain agreements. Memorandum in Support of KBC's Motion for Summary Judgment, Adversary No. 10-1980, dkt. No.58, p. 8.

They claim to be financial participants as they had securities contracts or swap agreements with a debtor or other entity of a total gross dollar value of not less than $1,000,000 in notional or actual principal outstanding at the appropriate time as required by 11 U.S.C. § 101(22A)(A). The confirmation agreements are alleged to have been equity option agreements under which an entity sold to fund-of-funds a call option to purchase a basket of equity investments in hedge funds. Swap agreements are defined under 11 U.S.C. § 101(53B)(A)(i)(IV) as any agreement which . . . is an equity index or equity swap, option, future, or forward agreement.

The Defendants assert that the transactions were made in connection with the confirmation agreements as they were made pursuant to them. The term "in connection with" is by its own terms very broad; in the context of avoidance of transfers it has been interpreted to mean "related to an agreement." *In re Casa de Cambio Majapara S.A. de C.V.,* 390 B.R. 595, 599 (Bankr. N.D. Ill. 2008). The Defendants convincingly argue that the transfers satisfy these requirements and are protected from recovery and avoidance by the Trustee.

The Trustee argues that the swaps are not protected by Section 546(g) because the agreements were with non-debtor parties. This is not dispositive. Section 546(g) does not require that the transactions be structured or tailored to include the debtor as a party. The transfers/swaps are protected if the recipient is a financial participant according to its terms and if they are made in connection with the appropriate agreement.

The Trustee's resistance to the Section 546(g) defense based on the taint of fraud exception has been addressed herein at Section V(a) in the court's discussion of taint of fraud in relation to Section 546(e).

The Trustee's opposition to the Section 546(g) defense where he argues that the Defendants

have provided no evidence that avoidance of the transfers would threaten the stability of the

financial markets has been addressed herein at Section V(b) in relation to Section 546(e).

## VI. CONCLUSION

For the foregoing reasons the Motions for Summary Judgment are GRANTED as to the

Counts alleging Preferential Transfers and Constructive Fraudulent Transfers under Bankruptcy

Code Sections 547, 548(a)(1)(B), 550 and 544 as well as under Illinois law.   The Motions for

Summary Judgment will be denied as to the Actual Fraudulent Transfer claims alleged under

Bankruptcy Code Section 548(a)(1)(A).

Separate Orders will be entered on each Motion for Summary Judgment.  Before the court

enters those Orders, however, it invites the parties to submit briefs on whether the Orders resolve

core matters on which this court may enter final Orders in light of the Supreme Court's ruling in

*Stern v. Marshall,* 131 S.Ct. 2594 (2011) and the recent Seventh Circuit Court of Appeals ruling in

*Ortiz v. Aurora,* 665 F.3d 906 (7th Cir. 2011).   Those supplemental briefs must be submitted on or

before March 25, 2012.  The court will take the supplemental briefs under advisement unless it

finds that the complexity of the issues asserted warrant an additional  hearing.

Dated: March 7, 2012                    ENTERED:    *Jacqueline P. Cox*

J. P. Cox

Jacqueline P. Cox
United States Bankruptcy Judge

-23-